IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VALERO ENERGY CORPORATION,<br>In its Own Right and as Successor to Ultramar<br>Diamond Shamrock Corporation<br><br>　　　　　　　　Petitioner,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　Respondent. | Case No. 06 C 6730 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Valero Energy Corporation has petitioned the Court to quash two summonses issued by the Internal Revenue Service (IRS) to Valero's tax advisors, Arthur Andersen, LLP, in connection with a matter before the IRS. The IRS investigation focuses on Valero's potential income tax liability under the Internal Revenue Code and for Valero's possible use of potentially abusive tax shelters. On December 31, 2001, Ultramar Diamond Shamrock Corporation (Diamond Shamrock), a Canadian company, merged with Valero, and Valero is the surviving entity. Valero brings this action on its own behalf and as a successor to Diamond Shamrock. For the reasons stated below, the Court grants Valero's motion in part and denies it in part.

### Background

Valero is a Fortune 500 company that, through its subsidiaries, indirectly owns and operates eighteen refineries and markets refined oil and gas products. One of Valero's refineries was previously owned by Diamond Shamrock and is located in Canada. Valero acquired this refinery after the 2001 merger and began marketing refined oil and gas products in Canada.

In 2006, pursuant to 26 U.S.C § 7602, the IRS issued an administrative summons to Valero and Arthur Andersen LLP. The summons is directed to Arthur Andersen, an accounting firm that provided tax advice to Valero for its merger with Diamond Shamrock. The government seeks to examine the books, papers, and other records relating to the federal tax liability of Valero and its subsidiaries for calendar years 2002 and 2003. In the summons, the IRS focuses on the deductions Valero claimed under the international transaction provisions of the Internal Revenue Code, including provisions relating to branch transactions, foreign currency transactions, dual consolidated losses, overall foreign losses, and hedge positions in connection with fluctuation risks. Many of Valero's claimed losses involved the Canadian subsidiaries that Valero acquired as a result of the merger with Diamond Shamrock.

In November 2006, the IRS served Arthur Andersen with the first summons. In January 2007, after Valero had filed a petition to quash the first summons, the IRS served a second summons, which clarified the scope of the first summons. The government has since withdrawn its first summons and seeks to enforce only the second one. In the second summons, the IRS sought

> [a]ll documents . . . related to, or reflecting, tax planning, tax research or tax analysis, by or for [Diamond Shamrock] (including any of its subsidiaries or partnerships, both domestic and foreign) and [Valero] (including any of its subsidiaries or partnerships, both domestic and foreign) in connection with their 2001, 2002 and 2003 Canadian and U.S. income taxes. . . .

*See* Amended Mot. to Quash, Ex. A-1 at 3. Because Valero is identified in the summons and is entitled to notice of the summons, it has standing to bring this motion. *See* 26 U.S.C. § 7609(a)(1) and (b)(2). The entity to be summoned, Arthur Andersen, is based in the Northern District of Illinois, which is also the place where the documents in question are to be produced,

2

giving this Court jurisdiction over the proceeding. *Id*. § 7609(h)(1).

## Discussion

Valero has moved to quash the summons on the grounds that it is vague, overbroad, and fails to meet all the requirements for enforcement. Valero also argues that certain of the documents the IRS requests are subject to the work product privilege under Federal Rule of Civil Procedure 26(b)(3). FED. R. CIV. P. 26(b)(3). Valero also contends that pursuant to 26 U.S.C. § 7525(a)(3)(A) and (B), the documents that the IRS seeks are privileged and not subject to production because they are confidential communications between a taxpayer and a federally authorized tax practitioner for the purpose of obtaining tax advice.

**1.   Breadth of the summons**

Valero contends that the IRS's second summons is vague and sweeps too broadly in its scope, making it difficult for Arthur Andersen and Valero to know what documents the IRS wants. On a motion to quash an IRS summons, the district court reviews the summons and as part of this review considers whether the summons has been "made in good faith and seek[s] information relevant to a legitimate investigative purpose." *United States v. BDO Seidman*, 337 F.3d 802, 809-10 (7th Cir. 2003) (*BDO I*) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)).

Under 26 U.S.C. § 7602, Congress granted the IRS the broad power to issue summonses to investigate violations of the tax code. *Id*. The IRS has the broad power to investigate possible violations of the tax laws to ensure the "efficacy of the federal tax system, 'which seeks to assure that taxpayers pay what Congress has mandated and to prevent dishonest persons from escaping taxation thus shifting heavier burdens to honest taxpayers.'" *Id*. at 810 (quoting *United States v.*

*Bisceglia*, 420 U.S. 141, 146 (1975)). The Supreme Court has noted that the "language of § 7602 reflects . . . a congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984) (emphasis in original).

The IRS's investigatory power, however, is not absolute. A summons, if challenged, must meet the requirements for enforcement set out in *United States v. Powell*. *Powell*, 379 U.S. at 57-58. The Seventh Circuit has long applied the four operative factors from *Powell* to guide the judicial enforcement of a summons:

> [T]he government must make a *prima facie* case that the IRS issued the summons in good faith. . . . The government must only show: the investigation underlying the summons has a legitimate purpose; the information sought may be relevant to that purpose; the information is not already in the IRS's hands; and the IRS has followed the statutory steps for issuing a summons. The government typically makes that showing through the affidavit of the revenue agent conducting the audit.

*2121 Arlington Heights Corp. v. IRS*, 109 F.3d 1221, 1224 (7th Cir. 1997) (citations omitted). If the government meets its burden, then the onus shifts to the taxpayer to show that enforcement of the summons would constitute an abuse of process. *Id.* The taxpayer can show that by disproving the existence of one of the *Powell* factors or pointing to specific facts indicating that the IRS issued the summons in bad faith. *See United States v. Stuart*, 489 U.S. 353, 360 (1989); *2121 Arlington Heights*, 109 F.3d at 1224; *United States v. Kis*, 658 F.2d 526, 538 (7th Cir. 1981).

Valero argues that the IRS lacks a legitimate purpose in seeking information with respect to all tax planning, tax research, or tax analysis for Valero's 2001 - 2003 tax returns. Valero contends that because the IRS's inquiry is focused on the 2002 deductions resulting from the Canadian restructuring and refinancing, information outside of that specific inquiry is not

4

legitimate. Valero also argues that the IRS already has in its possession the documents it needs to determine Valero's tax liabilities for 2002 and 2003. Specifically, Valero says it has produced over 2,000 pages of documents in response to IRS requests pertaining to the Valero – Diamond Shamrock restructuring and refinancing.

In support of the second summons, however, the IRS has submitted a declaration from Agent Philip H. Ryder, who works in the Large and Mid-Size Business Division, Natural Resources & Construction Territory 4 of the IRS. In his declaration, Agent Ryder states that he is conducting an investigation into the tax liabilities of Valero and its subsidiaries for 2002 and 2003. Agent Ryder attests that to assist in this investigation, the IRS has sought documents and testimony limited to Valero's 2001, 2002, and 2003 federal income tax liabilities. He explains that it is necessary to obtain the testimony and examine the materials sought by the summons to investigate fully the federal tax liability of Valero and its subsidiaries for the 2002 and 2003 tax periods. Specifically, Ryder states that one focus of the investigation concerns

> the deductions claimed by [Valero] under the international provisions of the Internal Revenue Code, including provisions relating to branch transaction, foreign currency transactions, dual consolidated losses, overall foreign losses, and hedge positions in connection with currency fluctuation risks. Valero's Form 1120 provided very little information regarding the claimed losses. Many of the claimed losses involved the Canadian subsidiaries that Valero acquired as a result of the merger with Ultramar Diamond Shamrock.

*See* Resp. to Amended Pet. to Quash, Ex. A at 6. Ryder states that as of March 9, 2007, the date of his amended declaration, the summoned entities had not produced all of the books, papers, records, or other data or privilege logs in response to the summons. He further says that the information that the IRS sought with the summons is not already in its possession. Agent Ryder also details the steps he took to issue the summons and attests that he followed the administrative

steps required by the Internal Revenue Code for issuance of the summonses.

The government's hurdle to prove a *prima facie* case is not a high one. *See 2121 Arlington Heights Corp.*, 109 F.3d at 1224. As Agent Ryder explained, the IRS's investigation seeks information related to the tax liabilities of Valero and its subsidiaries for 2002 and 2003. Under section 7602, the IRS has broad power to investigate possible violations of the tax code so that it can ensure the "efficacy of the federal tax system." *BDO I*, 337 F.3d at 810. Valero's claim that the IRS's inquiry must be narrowed to be legitimate fails in light of the long-held policy that the IRS has broad power to investigate income tax liability. *See Arthur Young*, 465 U.S. at 816. The government need only show that the information the IRS seeks "may be relevant" to its legitimate purpose. *See 2121 Arlington Heights Corp.*, 109 F.3d at 1224. This standard permits an expansive reach by the IRS to determine tax liability. *See Arthur Young*, 465 U.S. at 816.

The government contends that the IRS's task in reviewing the transactions includes determining whether the claimed tax benefits from the transactions are allowable. To do this, it argues, it must examine the purported business purpose of the transaction, which requires looking at multiple sources of information from the tax years in question to determine Valero's legitimate tax liability. Agent Ryder states in his amended declaration that the IRS seeks information regarding Valero's participation in an alleged plan to avoid taxes through the use of cross-border circular cash flows between its related entities. *See* Resp. to Amended Pet. to Quash, Ex. A at 10-11. He says that the information requested by the summons concerning Arthur Andersen's tax planning, research and analysis before and after the transactions took place and Valero's participation in a circular tax flow plan is relevant to determining the

economic substance of the transactions. *Id*. Further, he explains that the IRS seeks documents to determine whether some of the transactions were designed to generate additional deductions in foreign jurisdictions while also creating deductions on its domestic tax liabilities. *Id.*

The Court cannot say that the IRS's investigation into Valero's income tax liability is illegitimate. *See Arthur Young*, 465 U.S. at 816. Via the second summons, the IRS is trying to determine whether Valero has "pa[id] what Congress has mandated . . ." *BDO I*, 337 F.3d at 810. Agent Ryder has explained that documents concerning the 2001 lead-up to the merger and documents concerning restructuring transactions may shed light on Valero's tax liability for the 2002 and 2003 tax years. *See* Resp. to Amended Pet. to Quash, Ex. A at 7. Further, Agent Ryder attests that the IRS seeks these documents to determine whether there is economic substance to the transactions and whether Valero made legitimate deductions on United States tax returns. *Id*. at 10-11. The Court finds that the information the IRS seeks, namely, information for the tax years immediately preceding and following the year in which Valero restructured its Canadian subsidiary, may be relevant to this legitimate purpose. *2121 Arlington Heights Corp.*, 109 F.3d at 1224.

Valero's contention that the IRS already has enough information in its possession does not preclude the IRS from obtaining documents from other sources which may contain similar, additional, or contradictory information. *See Arthur Young*, 465 U.S. at 816. Moreover, Agent Ryder declared that the information the IRS seeks is not in its possession. Typically, an Agent's sworn declaration detailing the IRS's *prima facie* case is sufficient to satisfy the government's burden. *2121 Arlington Heights Corp.*, 109 F.3d at 1224. Valero has given the Court no reason to question the Agent's declaration and has not shown that the IRS has failed to meet one of the

*Powell* requirements.

Because the government has made out a *prima facie* case, the burden shifts to Valero to show that the summons was issued in bad faith or that enforcement of the summons amounts to an abuse of process. *Id*. Valero does not argue that either of these factors are at play here. For these reasons, the Court declines to quash the amended summons on the basis that it is vague, overbroad, or does not meet the *Powell* requirements.

The Court directs Valero to turn over non-privileged documents responsive to the summons that it has withheld because of its overbreadth objections. With regard to any documents subject to a claim of privilege that the Court has not yet assessed, Valero must provide a privilege log to the government and must provide the Court both the log and a copy of the documents so the Court can conduct an *in camera* review to determine whether the claimed privilege applies.

**2.      Work product doctrine**

Valero contends that many of the requested documents are protected from disclosure under the work product doctrine. The work product doctrine protects against the discovery of documents and other tangible items that would be otherwise discoverable. *See Upjohn Co. v. United States*, 449 U.S. 383, 398-99 (1981) (noting that a tax summons is subject to traditional protections, such as the work product doctrine). The work-product doctrine "shields materials that are prepared in anticipation of litigation from the opposing party, on the theory that the opponent shouldn't be allowed to take a free ride on the other party's research, or get the inside dope on that party's strategy. . ." *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767-68 (7th Cir. 2006) (citations omitted). The doctrine applies, however, only when "the document

8

can fairly be said to have been prepared or obtained *because* of the prospect of litigation."
*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996) (emphasis in original) (citations omitted).

Though significant paperwork is generated in any business transaction, the Seventh Circuit has noted that "it is important to distinguish between an investigative report developed in the ordinary course of business as a precaution for the remote prospect of litigation and materials prepared because some articulable claim, *likely* to lead to litigation . . . ha[s] arisen." *Id*. at 977 (emphasis in original) (internal citations and quotation marks omitted). The Seventh Circuit has held that "'[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials . . . with the work product privilege; the privilege is not that broad.'" *Id.* at 976 (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983)).

Valero offers a declaration by Wyatt Stripling, the Director of Tax of Valero Energy Corporation and Vice President of Tax of Valero Services, Inc. *See* Valero Reply, Ex. B ¶ 9. Stripling is ultimately responsible for United States federal income tax matters for Valero. Stripling states that when Valero entered into the merger with Diamond Shamrock, Valero believed it was highly likely that the IRS would challenge the tax results of the restructuring and refinancing and that litigation with the IRS would follow. *Id*. Valero argues that as a result, the documents prepared by Arthur Andersen for Valero were created in anticipation of litigation and are therefore subject to the work product doctrine.

Valero produced to the Court for *in camera* review several documents that it claims are subject to the work product doctrine. The Court has reviewed these documents and has considered Stripling's declaration. The documents are best categorized as having been prepared

9

during the ordinary course of business, with the possibility of future litigation being secondary at most. *See Logan*, 96 F.3d at 977. In arguing that the documents are protected, Valero confuses the possibility of litigation with the requirement that to be protected, a document must have been prepared *because of* anticipated litigation. The fact that Valero hired Arthur Andersen with an eye toward the complex nature of the transaction, and the possibility that the IRS might investigate, does not support a contention that Arthur Andersen prepared its materials because Valero or Andersen anticipated actual litigation. Valero has failed to establish the applicability of the work product doctrine.

In light of the Court's rejection of Valero's claims of protection under the work product doctrine, the documents listed on the privilege log denoted as privileged solely under the work product doctrine must be produced. The Court directs Valero to produce the following documents: AA02535-AA002540; AA003143; AA003144-AA003145; AA003146-AA003148; AA003149-AA003151**;** AA003164; AA003165-AA003167; AA003168-AA003170; AA003171-AA003173; AA003174-AA003179; AA003215;[1] AA003247-AA003253; AA003267; AA003270-AA003274; AA003275; AA003354.

### 3.     Tax practitioner's privilege

Valero also argues that several of the documents that the IRS seeks are subject to the tax practitioner privilege. The tax practitioner privilege was created by Congress and is interpreted in a fashion similar to the common law attorney-client privilege. *See BDO I*, 337 F.3d at 810-12; *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1990). Under the tax practitioner

---

[1] The number listed on the privilege log for document AA003215 is listed incorrectly as AA003115. Based on the description of the document and the sequential numbering of the list, the Court uses the number associated with the actual document.

privilege,

> the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and a federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

26 U.S.C. § 7525(a)(1). To be protected, a communication must be made for the purpose of obtaining tax advice from a federally authorized tax practitioner. *See BDO I*, 337 F.3d at 810-12. A federally authorized tax practitioner is "any individual who is authorized to practice before the IRS." 26 U.S.C. § 7525(a)(3)(A). Tax advice is "advice given by an individual with respect to a matter which is within the scope of the individual's authority to practice." *Id.* § 7525(a)(3)(B).

There are limitations on the scope of the tax practitioner privilege. First, the privilege applies only to communications made on or after the statute's enactment date of July 22, 1998. *See BDO I*, 337 F.3d at 810. In addition, the statute limits the application of the privilege to "noncriminal tax matters before the IRS," 26 U.S.C. § 7525(a)(2)(A), and "noncriminal tax proceedings in Federal court brought by or against the United States." 26 U.S.C. § 7525(a)(2)(B). Further, as the Court discusses in greater detail below, there is a statutory exception relating to a tax practitioner's promotion of a tax shelter to a client. *Id*.

A party that invokes the tax practitioner privilege must establish each element of the privilege. *BDO I*, 337 F.3d at 811. A party seeking to assert a section 7525 privilege bears the same burden as a party seeking the attorney-client privilege. *Id.* The essential elements of the attorney-client privilege, and thus of the tax practitioner privilege, exist when "'legal advice of any kind is sought . . . from a professional legal adviser in his capacity as such, . . . the

11

communications relating to that purpose, . . . made in confidence . . . by the client, . . . are at his instance permanently protected . . . from disclosure by himself or by the legal adviser . . . [unless] the protection [is] waived.'" *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, EVIDENCE IN TRIALS AT COMMON LAW § 2292 (John T. McNaughton rev. 1961)). These same principles extend to tax advice a taxpayer seeks from a tax practitioner under section 7525. *BDO I*, 337 F.3d at 811 (citations omitted).

To support its privilege claim, Valero has presented the declarations of Stripling and Amin Nosrat, the Arthur Andersen tax partner responsible for the tax advice services in question. Valero states that Nosrat was a federally authorized tax practitioner within the meaning of section 7525(a)(3)(A). Stripling says that Valero sought confidential tax advice from Arthur Andersen in connection with several transactions surrounding the merger of Valero and Diamond Shamrock. Stripling also states that in seeking that tax advice, Valero intended for that advice to be confidential and that it was in fact confidential.

The government argues that Valero has yet to produce an engagement letter detailing the terms of Valero's agreement with Arthur Andersen. Without an engagement letter, the government contends, Valero has not corroborated the claims of confidentiality contained in its declarations. A written agreement, however, is not essential to the existence of the privilege. Rather, the taxpayer need only show that it had a reasonable belief that a confidential relationship existed. *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1317 (7th Cir. 1978) (noting that the professional relationship is not dependent upon the execution of a formal contract, rather the reasonable belief of the client is sufficient to establish the relationship).

In Stripling's declaration, he states that Valero retained Arthur Andersen to review its restructuring and refinancing plans. *See* Valero Reply, Ex. B ¶ 6. Stripling also says that confidential communications took place between representatives of Valero, Diamond Shamrock, and Arthur Andersen for confidential tax advice regarding the restructuring. *Id.* Nosrat states that, as the tax partner in charge of the Valero engagement, it was his understanding that Valero retained Arthur Andersen to give Valero and Diamond Shamrock confidential tax advice with respect to certain transactions. *See* Valero Reply, Suppl. Materials, Ex. 10 ¶¶ 4 & 6. In light of Valero's reasonable belief that it had a confidential tax adviser in Arthur Andersen, the Court concludes that the tax practitioner privilege applies to certain communications between Valero and Arthur Andersen.

The Court has conducted a document-by-document *in camera* review of the items provided by Valero as to which it has asserted the tax practitioner privilege. The Court took into account the totality of the circumstances in considering whether the documents met each of the elements of the tax practitioner privilege. *See United States v. BDO Seidman*, __F.3d__, Nos. 05-3260, 05-3518, 2007 WL 1880208, at *2, *11 (7th Cir. July 2, 2007) (*BDO II*) (citation omitted). In this examination, the Court reviewed the documents to determine whether confidential tax advice was being sought by Valero or given by Arthur Andersen. *See BDO I*, 337 F.3d at 811. After this review, and keeping in mind the totality of the circumstances, the Court finds that the documents that Valero claims fall under the tax practitioner privilege do indeed satisfy the required elements for the privilege to apply.

4. **Tax shelter exception**

The government argues that the tax shelter exception to the tax practitioner privilege

13

eviscerates Valero's claim of privilege for certain documents. Under the tax shelter exception, the tax practitioner privilege does not apply to "any written communication between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii))." *See* 26 U.S.C. § 7525(b);[2] *BDO I*, 337 F.3d at 810. A tax shelter is defined as "a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, if a significant purpose of such partnership, entity, plan or arrangement is the avoidance or evasion of Federal income tax." 26 U.S.C. § 6662(d)(2)(C)(ii).

"As with any other exception to a claimed privilege, the burden rests on the opponent of the privilege to prove preliminary facts that would support a finding that the claimed privilege falls within an exception." *BDO II*, __F.3d__, Nos. 05-3260, 05-3518, 2007 WL 1880208, at *12. The party opposing the privilege meets this burden by presenting "enough evidence to show some foundation in fact that the exception applies." *Id*. (citations and internal quotation marks omitted). To meet this burden,

> the IRS must bring forward evidence that: (1) the communication relates to a tax shelter, as defined by § 6662(d)(2)(C)(ii); (2) the communication was made by a director,

---

[2] Because the IRS's inquiry focuses on income tax liability that pre-dates the 2004 amendment to 26 U.S.C. § 7525(b), the Court applies the version of the tax shelter exception that existed prior to 2004. *See BDO II*, __F.3d__, Nos. 05-3260, 05-3518, 2007 WL 1880208, at *12 and n.12. The American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004), amended section (b). The changes apply only to communications made after October 24, 2004. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 813(b), 118 Stat. 1418, 1581 (2004). The Act did not alter the elements of the tax practitioner privilege. Prior to 2004, however, subsection (b) referred to the definition of "tax shelter" that was then found at 26 U.S.C. § 6662(d)(2)(C)(iii). For ease of reference, the Court will refer to the current section of the tax shelter definition, which is found at 26 U.S.C. § 6662(d)(2)(C)(ii).

shareholder, officer, or employee, agent, or representative of the corporation; and (3) the communication was made in connection with the promotion of the direct or indirect participation of the corporation or tax shelter.

*Id.*, at *17.

The government contends that because certain of Valero's transactions surrounding its merger with Diamond Shamrock had the effect of avoiding federal income taxes, the documents regarding the so-called step plan and refinancing transactions should be produced pursuant to 26 U.S.C. § 7525(b). Valero, however, argues that the government is blurring the prerequisites to the tax shelter exception's application. Specifically, Valero contends that the transactions in question did not involve the promotion of tax shelters and that the government has not identified any facts suggesting that this was the case.

The government contends that it has presented evidence sufficient to establish the applicability of the tax shelter exception. It points to Valero's application of a "step plan" that involved wire transfers and a resulting foreign exchange loss of over $100 million. The IRS contends that "[i]ncome tax losses of over $100 million are certainly a significant benefit of the refinancing transactions, and Valero does not allege that this was not one of [the] purposes for entering in to the transaction." *See* Gov't Surreply at 8.

The government appears to have it both backwards and wrong. First, as indicated earlier, Valero does not have to negate the applicability of the tax shelter exception; rather, the government has the burden of showing that it applies. Because the government bears the burden, the fact that Valero "does not allege" that tax avoidance was not a purpose of the transaction is of no consequence.

Second, aside from the allocation of the burden of persuasion, the application of the tax

15

shelter exception to the privilege does not come into play simply because tax avoidance is "one of the purposes" of the transaction; rather the transaction must be one in which tax avoidance is a "significant purpose." The distinction is not immaterial. It is fair to assume that most corporate transactions are structured in a way to minimize the resulting tax obligation. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978) ("We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction."). Under the law's definition of a tax shelter, the fact that a person or entity may have considered minimization of its tax obligations does not make the transaction a "tax shelter." *See Id.* at 583-84; *see also*, *Compaq Computer Corp. and Subsidiaries v. C.I.R.*, 277 F.3d 778, 781 (5th Cir. 2001) (noting that "'the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations.'"). If it did, the statutory tax practitioner privilege would be, as a practical matter, a virtual dead letter.[3]

In its briefs in the present case, the government has made no effort to address, either directly or inferentially, the purpose of the transaction at issue. Instead, its arguments are based entirely on the income tax effect of the transaction. If showing that a transaction's resulted in a significant tax benefit were sufficient to bring the tax shelter exception into play, the tax practitioner privilege that Congress adopted would be significantly weakened. Argument about the tax effect of a transaction, without more, is in this Court's view insufficient to satisfy the

---

[3] As Valero points out, the government's argument, if taken to its logical conclusion, would mean that an individual's decision to invest earnings in a qualified retirement plan that allowed him to avoid paying taxes on those earnings would constitute involvement in a tax shelter, and any confidential communication with its tax advisor concerning the decision or the plan would be subject to the tax shelter exception to the tax practitioner privilege. There is no reason to believe that this is what Congress intended in establishing either the privilege or the exception.

16

government's burden.

The Court certainly can imagine a case in which a showing that a transaction produced a significant tax benefit, combined with analysis showing the relative absence of other significant benefits or purposes, would suffice to meet the government's burden of showing a "foundation in fact" permitting application of the tax shelter exception. But this is not such a case. As the Court has indicated, the government has made no such argument in its briefs. The Court has, on its own, searched the government's supporting materials for something that might support an argument along these lines. It has found only a statement in Agent Ryder's declaration to the effect that the transactions involved "circular cash flows [that] involved numerous wire transfers on the same day from bank accounts which were opened and closed on the same day and had only one transaction, and which have no readily identifiable economic effect or purpose." Ryder Decl. ¶ 17. What Ryder says, in essence, is that he cannot think of any legitimate reason for the transaction. Without more, this is far too conclusory to satisfy the government's burden.

Valero has identified one additional flaw in the government's argument. The tax shelter exception does not apply to all advice about transactions or plans that might be considered tax shelters; rather, it applies to communications "made in connection with the promotion of" participation in a tax shelter. There is nothing in the government's submission that reflects that Valero's dealings with Arthur Andersen had anything to do with "promotion" of participation in a tax shelter.

For each of these reasons, the Court finds that the government has failed to show a "foundation in fact" for its contention that the tax shelter exception applies.

## Conclusion

For the foregoing reasons, the Court grants Valero's motion to quash the summons as it relates to the documents inspected *in camera* as to which Valero claimed the tax practitioner privilege but denies the motion as it relates to Valero's objections of overbreadth and claims of privilege under the work product doctrine [docket nos. 1 & 26]. The Court directs Valero to produce the documents responsive to the second summons that it has thus far withheld based only on overbreadth or work product objections. The case is set for a status hearing to be held in open court on September 5, 2007 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2007