**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **VALERO ENERGY CORP.,**<br>**In its Own Right and as Successor**<br>**to Ultramar Diamond**<br>**Shamrock Corporation**, )<br><br>**Petitioner,** )<br><br>**vs.** )<br><br>**UNITED STATES OF AMERICA,** )<br><br>**Respondent.** ) | **Case No. 06 C 6730** |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The United States has moved for the entry of a further order of enforcement of an Internal Revenue Service summons issued to Valero Energy Corporation's tax advisors, Arthur Andersen, LLP, in connection with a matter before the IRS. The IRS investigation focuses on Valero's potential income tax liability for the years 2002 and 2003 and on its possible use of tax shelters. The government seeks production of various documents turned over to Valero by Andersen, which Valero has withheld under claims of privilege. The government also seeks the production of, or further information about, additional documents from Andersen that Valero has withheld as non-responsive. Also before the Court is Valero's request that the Court enter an order sustaining Valero's objections to four documents it has withheld on Andersen's behalf. For the reasons stated below, the Court grants the government's motion in part and denies it in part and grants Valero's request regarding the four documents.

1

**Background**

In connection with its merger with Ultramar Diamond Shamrock Corporation, a Canadian company, Valero retained Andersen in 2001 and 2002 to provide United States and Canadian tax advice and accounting advice. The merger, which took place on December 31, 2001, left Valero as the surviving entity. In 2002, a series of transactions involving Valero and its Canadian subsidiaries resulted in approximately $100 million in foreign currency losses for Valero—losses which in turn produced approximately $46 million in United States federal income tax savings for Valero in 2002.

In November 2006, pursuant to 26 U.S.C § 7602, the IRS issued an administrative summons to Andersen. Valero filed a petition to quash this summons, and in January 2007, the IRS served a second summons clarifying the scope of the first. The government has withdrawn the first summons and seeks to enforce only the second one. In its second summons, the IRS asked for

> [a]ll documents . . . related to, or reflecting, tax planning, tax research, or tax analysis, by or for, Ultramar Diamond Shamrock . . . and Valero Energy Corporation . . . in connection with their 2001, 2002 and 2003 Canadian and U.S. income taxes. . . .

*See* Gov't Resp. to Amended Mot. to Quash, Ex. A-4 at 6.

After the Court ordered Valero to produce all non-privileged responsive documents and a log detailing Valero's claims of privilege, Valero moved to quash the second summons. It argued that the summons was vague, overbroad, and failed to meet all the requirements for enforcement. Valero also argued that some of the requested documents were subject to the work product privilege and that some were

2

privileged under the "tax practitioner" privilege established by 26 U.S.C. § 7525(a)(3)(A) and (B) because they were confidential communications between a taxpayer and a federally authorized tax practitioner made for the purpose of obtaining tax advice.

In response, the government argued that because certain of Valero's transactions surrounding its merger with Diamond Shamrock had the effect of avoiding federal income taxes—and because Valero did not allege that tax avoidance was not a purpose of the transactions—the documents relating to those transactions fell within the tax shelter exception to the tax practitioner privilege. In its brief, the government took the position that it was Valero's burden to show that the documents did not fall under the exception.

On August 23, 2007, after reviewing *in camera* the documents Valero withheld under claims of privilege, the Court granted Valero's motion to quash the summons in part and denied it in part. *Valero Energy Corp. v. United States*, No. 06 C 6730, 2007 WL 4179464, *1 (N.D. Ill. Aug. 23, 2007). Specifically, the Court found that the IRS summons was not overly broad and that the work product doctrine did not apply to the documents Valero withheld because Valero had not shown that they were prepared in anticipation of litigation. *Id.* at *4, *6. The Court found, however, that the tax practitioner privilege applied to certain documents and that the government, which bore the burden of showing that the tax shelter exception applied, had failed to show a foundation in fact for application of the exception. *Id.* at *8–9. Indeed, after searching the government's submissions for any possible support for an argument that there was such a foundation in fact, the Court found only IRS Agent Philip H. Ryder's statement that the transactions involved same-day circular wire transfers between bank accounts

3

opened for one day only and that the IRS could not identify any economic effect of or purpose for the transactions. *Id.* at *9. The Court found that Ryder's rather conclusory affidavit was, without more, insufficient to carry the government's burden. *Id.* Finally, the Court directed Valero to turn over the non-privileged responsive documents that it had previously withheld and to provide a privilege log for any documents subject to a claim of privilege that the Court had not yet assessed. *Id.* at *10.

On September 5, 2007, Valero informed the Court and the government that Andersen had located approximately twenty additional boxes of documents that were potentially responsive to the summons in light of the Court's August 23, 2007 decision. From these boxes, Valero produced approximately 200 pages of Andersen billing sheets and time records, seventy-three of which Valero partially redacted based on a claim that their content was covered by the tax practitioner privilege.

On October 25, 2007, Valero produced the documents it had previously withheld on the basis of the work product claim that the Court had overruled. It also produced a supplemental privilege log claiming the tax practitioner privilege for the redacted portions of the newly-obtained Andersen billing sheets and for over two hundred other newly-obtained documents withheld in their entirety on the grounds of that privilege and, in some cases, the attorney-client privilege. The same day, Valero asked the Court to sustain objections in Valero's original privilege log to the production of four documents that it contends contain tax advice Andersen provided to other clients.

The government filed the present motion to enforce on December 20, 2007. That same day, Valero submitted an amended supplemental privilege log, incorporating documents that it had previously claimed as responsive but privileged but that it now

4

believed to be non-responsive.

In its current motion, the government asks for production of all of the documents Valero withheld in their entirety and unredacted versions of the billing sheets Valero produced in redacted form. The government also asks the Court to direct Valero to produce or describe in greater detail the contents of the boxes of documents that Andersen described as potentially responsive but that Valero considers non-responsive.

Valero thereafter submitted for *in camera* inspection the documents involved in the disputed claims of privilege. It subsequently amended its privilege log again, submitting a second amended supplemental privilege log along with its response to the government's present motion. In this decision, the Court will refer only to the second amended supplemental privilege log. In its privilege log, Valero contends that the tax practitioner privilege protects from production all of the documents it has withheld and that a handful of documents are also protected under the attorney-client privilege.

## Discussion

The government contends that Valero is withholding documents outside the scope of the claimed tax practitioner and attorney-client privileges, that it has not sufficiently established its new claims of privilege, and that in any event, the tax shelter exception to the tax practitioner privilege applies.

## 1.     Scope of the tax practitioner privilege

The government seeks the production of all withheld documents that relate to Canadian tax advice or to business or accounting advice, arguing that such documents are not privileged. The government contends that because Valero retained Andersen in part to provide business and accounting advice and Canadian tax advice, some of the

documents Valero has withheld as non-responsive or privileged are likely to relate to Canadian, rather than United States, tax advice, or to business and accounting advice, rather than tax advice.

The statutory tax practitioner privilege is interpreted similarly to the common law attorney-client privilege.  *See United States v. BDO Seidman*, 337 F.3d 802, 810-12 (7th Cir. 2003) ("*BDO Seidman I*"); *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999).  The attorney-client privilege "protects confidential communications made between clients and their attorneys for the purpose of securing legal advice."  *In re A Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289, 291 (7th Cir. 2002). Though the privilege directly covers communications by the client, "statements made by the lawyer to the client will be protected in circumstances where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client."  *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000) (citations omitted).

The tax practitioner privilege provides that

> the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and a federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

26 U.S.C. § 7525(a)(1).  To be protected, a communication must be made for the purpose of obtaining tax advice from a federally authorized tax practitioner.  *See BDO Seidman I*, 337 F.3d at 810-12.  A federally authorized tax practitioner is "any individual who is authorized to practice before the Internal Revenue Service if such practice is subject to Federal regulation under section 330 of title 31, United States Code."  26

6

U.S.C. § 7525(a)(3)(A). Tax advice is "advice given by an individual with respect to a matter which is within the scope of the individual's authority to practice described in [26 U.S.C. § 7525(a)(3)(A)]." *Id.* § 7525(a)(3)(B). The scope of the tax practitioner privilege is further limited to "noncriminal tax matters before the IRS" and "noncriminal tax proceedings in Federal court brought by or against the United States." *Id.* § 7525(a)(2)(A) & (B). The statute provides an exception to the privilege relating to a tax practitioner's promotion of a client's participation in a tax shelter. *Id.* § 7525(b).

The government contends that because a tax practitioner cannot practice Canadian tax law before the IRS, the statutory privilege does not apply to Canadian tax advice. Andersen was retained partly to provide Canadian tax advice. Indeed, Valero has referred to an annual Canadian tax savings of C$12.9 million as a "highly-significant business purpose[]" for the series of transactions that the IRS is examining. *See* Valero Resp. at 8 & n.8. Yet Valero has produced, according to the government, only one memorandum containing Canadian tax advice. The government argues that it is highly likely that Valero has improperly withheld as non-responsive or privileged documents relating to Canadian tax advice.

Valero does not dispute that Canadian tax advice is not privileged under section 7525 but contends that it found references to Canadian taxes in only five documents it has claimed to be privileged: documents AA003680-3681, AA003683-3709, AA003731-3757, AA013905-13920, and AA013921-13925. It argues that it has properly withheld these documents because they contain pervasive references to privileged United States tax matters and thus cannot be produced in redacted form. *See IBJ Whitehall Bank & Trust Co. v. Cory & Assocs., Inc.*, No. 97 C 5827, 1999 WL 617842, at *9 (N.D. Ill. Aug.

7

12, 1999) (finding some documents "so pervasively filled with either privileged or work product material that the entire document[s were] privileged"),

Because communications pertaining to Canadian tax advice are not privileged under section 7525, the Court has assessed whether it is feasible to redact the privileged material from those five documents and any other documents containing references to Canadian taxes so that the non-privileged portions may be produced to the government. The Court discusses the results of that assessment later in this decision.

The tax practitioner privilege also does not apply to business advice or accounting services. *Frederick*, 182 F.3d at 502 ("Nothing in the new statute suggests that . . . nonlawyer practitioners are entitled to privilege when they are doing other than lawyers' work. . . ."); *see In re Grand Jury Subpoena*, 731 F.2d 1032, 1037 (2d Cir. 1984) (attorney-client privilege "is triggered only by a client's request for legal, as contrasted with business, advice"). The government argues that because Valero retained Andersen to provide accounting advice as well as tax advice, Valero likely has withheld under the tax practitioner privilege documents that actually reflect non-privileged business or accounting advice.

Valero agrees that there is no accountant-client privilege and that business advice is not privileged. Valero contends, however, that because the IRS summons does not request documents reflecting business or accounting advice, it has withheld such documents as non-responsive unless they contain advice relating to taxes and therefore are protected under the tax practitioner privilege. Documents Valero contends were non-responsive were not submitted to the Court for *in camera* review.

8

In the course of its *in camera* review, the Court has considered whether any documents—or portions thereof—contain business or accounting advice, or Canadian tax advice, rather than United States tax advice. When a document contains non-privileged material, the Court will direct redaction of any privileged portions and order the production of the remainder, to the extent that is feasible. If any documents appear to contain entirely non-privileged material, the Court will order the production of the entire document in unredacted form.

## 2. Sufficiency of Valero's privilege claim

A party invoking the tax practitioner privilege must establish each element of the privilege. *BDO Seidman I*, 337 F.3d at 811. The government contends that Valero has failed to meet this burden on a document-by-document basis. *See Holifield v. United States*, 909 F.2d 201, 204 (7th Cir. 1990) (applying the document-by-document requirement to the attorney-client privilege).

In the case of documents authored by Andersen or Ernst & Young, the government asserts that Valero has failed to establish that the authors were federally authorized tax practitioners and that the content of the documents rests on or reveals confidential communications made by Valero for the purpose of obtaining United States tax advice. The government also takes issue with the privilege log's allegedly vague descriptions of the documents' subjects, often with the phrase "with federal income tax" tacked onto the end, and it suggests that portions of the documents likely relate to non-privileged accounting or business advice. The government argues that the redactions from Valero's billing information sheets—many of them names or discussion topics—reflect an overly broad view of what constitutes a confidential communication.

9

In its response to the government's motion, Valero offered new declarations from Wyatt Stripling, the head of the Tax Department of Valero and its subsidiaries, and from Amin Nosrat, who from 1995 to 2002 was a tax partner at Andersen.  *See* Valero Exs. C & D.  Stripling states that the documents withheld under the section 7525 privilege reflect communications between representatives of Valero and federally authorized tax practitioners at Andersen and that they were not made in connection with any promotion of participation in a tax shelter.  Valero Ex. C ¶ 5.  Stripling provides the department affiliations or job titles of the Valero and Diamond Shamrock employees involved in the communications and states that each of them was "authorized to secure confidential tax advice on behalf of Valero and Diamond Shamrock and to engage in these confidential communications."  *Id.* ¶ 9.

Stripling identifies sixty-two documents as communications between Valero or Diamond Shamrock and federal tax practitioners at Andersen in connection with Andersen's confidential tax advice.  *Id.* ¶ 6.  Stripling also identifies thirteen documents that involve communications with federal tax practitioners at Ernst & Young, which collaborated with Andersen in providing federal income tax advice.  *Id.* ¶ 7.  Stripling states that twelve of the documents on the privilege log are either drafts of communications between Valero or Diamond Shamrock and Andersen or Ernst & Young or documents that "contain the substance of confidential tax advice given by tax practitioners at Andersen to Valero."  *Id.* ¶ 9.  Stripling contends that documents AA002254-2259 and AA013858-13860 reflect communications with Valero's attorneys at Fulbright & Jaworski LLP and Wachtell, Lipton, Rosen & Katz in connection with federal income tax advice and planning.  *Id.* ¶ 10.

Stripling acknowledges that the remaining documents on the privilege log appear to be internal to Andersen. He opines, however, that they "contain confidential internal communications and calculations" made in connection with providing tax advice to Valero. *Id.* ¶ 11. Stripling also states that although the billing sheets that Valero produced in redacted form are internal documents, the redacted portions "contain substantive information regarding confidential tax advice given to Valero." *Id.*

Nosrat states in his declaration that he has been a federally authorized tax practitioner within the meaning of section 7525 since the enactment of the privilege in 1998. Valero Ex. D ¶ 2. Nosrat also lists eighteen former Andersen partners and professionals who were federally-authorized tax practitioners. *Id.* ¶ 7. He states that after reviewing each of the documents listed in the privilege log, he believes that each of the documents was prepared by or given to Andersen in connection with the tax advice it was providing Valero. *Id.* ¶¶ 5-6. Nosrat explains that Andersen's duties included reviewing tax advice that Ernst & Young had formulated and using this advice to counsel Valero and Diamond Shamrock, either alone or in collaboration with Ernst & Young. *Id.* ¶ 8.

The Nosrat and Stripling declarations appear to cure the privilege log's shortcomings to the extent that they establish that the authors or recipients of documents are federally authorized tax practitioners. They add little of substance, however, regarding why the contents of withheld documents are privileged. Valero's submission of the documents for *in camera* review has, however, allowed the Court to draw its own conclusions as to the appropriateness of the claims of privilege. *See Holifield*, 909 F.2d at 204 ("Only when the district court has been exposed to the

11

contested documents and the specific facts which support a finding of privilege . . . for each document can it make a principled determination as to whether the . . . privilege in fact applies.").

The Court has conducted a document-by-document *in camera* review of the documents provided by Valero as to which it has asserted the tax practitioner and, in the case of a handful of documents, the attorney-client privilege. In determining whether the tax practitioner privilege applies, the Court considered the totality of the circumstances as to each document. *See In re Grand Jury Proceedings*, 220 F.3d 568, 572 (7th Cir. 2000). In the case of communications from Andersen to Valero, the Court has applied the rule that, just as communications from an attorney to a client "are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence," *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990), communications from a tax practitioner to a client are also privileged only in those circumstances. Bearing in mind all the principles discussed thus far, the Court finds makes the following findings, beginning with certain discrete categories of documents.

    **a.**    **Billing sheets**

Valero produced the following internal billing information documents to the government in redacted form: AA000978-980, AA000986-989, AA000995-999, AA001005-1008, AA001014-1018, AA001023-1025, AA001029-1030, AA001034-1035, AA001039-1040, AA001044-1045, AA001050-1051, AA001103, AA001107, AA001111, AA001115, AA001119, AA001123, AA001127-1128, AA001132-1133, AA001564, AA002647-2648, AA002650, AA002652, AA002653, AA002654, AA002657, AA002659,

12

AA002697, AA002699-2700, AA002701-2702, AA002704, AA002728, AA002737-2738, AA002741-2743, AA002746-2747, AA002749-2750, AA002752, AA002754-2756, AA002758-2759, AA002833-2836, AA002845, AA002884, AA002886, AA002888, AA002890, AA002892, AA002894, AA002897, AA002899, AA002901, AA002903, AA003070-3071, AA003074, AA003075-3076, AA010305, AA010308-10309, AA010453, AA010455, AA010457, AA010459, AA010461, AA010463, AA010468, AA010470, AA010472, AA010526, AA010527-10529, AA010530, AA010531, AA010532, AA010535-10538, AA010541, and AA011622-11623.  In support of its claim of privilege for the redacted portions of these documents, Valero states only that "to some extent, [they] contain substantive information regarding confidential tax advice given to Valero" and that if a document recorded a "conference regarding a substantive issue," it redacted the subject of the conference and the people participating in it. Valero Ex. C ¶ 12.

The government argues that Valero's redactions of its internal billing records reflect "a far too liberal view of what constitutes a confidential communication by the client."  Gov't Br. at 7 n.2.  The Court agrees.  Because the billing records were internal to Andersen and were not sent to Valero, their content is protected by the tax-practitioner privilege only to the extent that it reflects confidential communications between Andersen and Valero or advice Andersen gave.  To the extent the billing records' relatively cryptic references under the heading "description of work" can be deciphered, they plainly are not privileged.  To provide just a few examples, Valero has redacted entries giving the title of a project Andersen was working on (e.g., "PROJECT TWIN TOWERS" and "SOAR"); the task being performed (e.g., "due diligence" and "talk

13

to Mr. Thompson about open items"); the issue being worked on (e.g., "ES minimizer," "1033 issue," "Section 987," and "intl. tax planning"); and the initials of people with whom particular Andersen personnel spoke. The Court looked long and hard and could find only one entry that disclosed the contents of a communication by the client or advice by Andersen. That is the material after the semicolon on James Cole's entry for 12/17/2001 in the "description" section on documents AA010541 and AA002845. Valero may continue to redact that particular entry. All other billing sheets must be produced in unredacted form.

To the extent Valero may disagree with the Court's interpretation of these entries, the fact is that Valero's showing has fallen short of what is required to establish the applicability of the asserted privileges. "The mere assertion of a privilege is not enough; instead, [Valero] . . . has the burden of establishing all of its essential elements." *BDO Seidman I*, 337 F.3d at 811 (citations omitted). Valero's conclusory statement regarding the confidential nature of all of the redactions in its billing documents, *see* Valero Ex. C. ¶ 12, does not come close to meeting this burden. And, as the Court has stated, the documents do not, on their face, suggest their disclosure will reveal privileged information.

Indeed, it is clear that Valero has redacted certain categories of material that plainly are not protected under the tax practitioner privilege. First, as the government notes, the names of those who participated in communications are not privileged. The Court does not see how the very identity of the personnel with whom Andersen personnel communicated possibly could reveal Valero's confidences or Andersen's advice. Like the attorney-client privilege, the tax practitioner privilege "protects

14

confidential *communications* . . . and so ordinarily the identity of a client does not come within the scope of the privilege." *Id.* (emphasis in original) (citing *Tillotson v. Boughner*, 350 F.2d 663, 666 (7th Cir. 1965)).[1]

Second, as the government argues—and Valero acknowledges—documents containing Canadian income tax advice cannot be withheld on the basis of the tax practitioner privilege. In the Court's own review of the billing sheets, however, it noted several redactions that seemed to concern solely Canadian advice.

Third, Valero seems to have conflated the tax practitioner privilege with the work product doctrine, whose applicability the Court has previously rejected. Like the attorney-client privilege, the tax practitioner privilege protects client communications and U.S. tax advice; it does not protect descriptions of work done or general descriptions of topics unless they somehow reveal advice or communications. The Court sees nothing of the kind in the redacted billing entries. With the one exception referenced earlier, the redacted entries are not written in a way that suggests the content of client communications or tax practitioner advice. And, as the Court has noted, Valero has made no real effort to explain why the work description information should be considered privileged.

Finally, Valero mistakenly gave the Court one billing sheet, AA001119, in redacted form. The Court sees no basis to believe, however, that Valero's redactions from that document are any more appropriate than the others the Court has just

---

[1]   This rule's narrow exception, not applicable here, holds that a client's identity may be privileged "when so much of an actual confidential communication has been disclosed already that merely identifying the client will effectively disclose that communication." *BDO I*, 337 F.3d at 811 (citations omitted).

rejected.  Valero is directed to produce this document to the government in unredacted form.

### b. Fax cover sheets

Valero has claimed that documents AA8615, AA11661, AA11246, AA013694, AA13850, and AA013935— fax cover sheets between Andersen and Diamond Shamrock or Andersen and Valero—are protected by the tax practitioner privilege. Because these documents contain no information other than the sender's and recipient's names and phone numbers (and, in one instance, a brief, non-substantive message), however, Valero cannot reasonably claim that they reflect confidential communications.  *See McCook Metals LLC v. Alcoa Inc.*, 192 F.R.D. 242, 254 (N.D. Ill. 2000) (finding that fax cover sheets "bear insufficient relation to the securing of legal advice to be accorded attorney-client privilege").  The Court directs Valero to produce these documents to the government.

### c. Engagement letters

Valero has asserted the tax practitioner privilege with regard to the following documents, consisting of engagement letters between Andersen and Valero or Valero and Diamond Shamrock and descriptions of the nature and terms of the engagements: AA001088-90, AA001091-92, AA001161-62, AA001163-65, AA001271-75, AA001991, AA001992-95, AA001996-98, AA001999-2001, AA002002-04, AA002005-06, AA002007-09, AA002010-11, AA002012-14, AA009085-87, AA009088-90, AA010545, AA010546-49, AA010550-52, AA010553-56, AA010557-59, AA010560-62, AA010563-65, AA010566-68, AA010569-71, AA011632-36, AA011645-49, AA011662-63.  Several of the documents concern engagements related to the Texas franchise tax and are thus

16

not even arguably protected by the federal tax practitioner privilege: AA001161-62, AA001271-74, AA002005-06, AA002010-11, AA011632-36, AA011645-49, and AA011662-63. Other documents appear to be drafts or final versions of standard engagement letter terms that make no reference to advice, communications, or even the subject matter involved. Still others are so general in their description of the subject matter of the work to be done that no straight-faced argument can be made that they are privileged: AA001991 and AA010545.

This leaves only engagement letters and drafts relating to three projects, one involving analysis of the tax implications of transaction-related fees incurred in the Valero-Diamond Shamrock merger, one involving estimated tax payments, and one involving excise tax. Though these documents provide a description of the process Andersen proposed to use in these projects, the Court sees nothing in them that would disclose the contents of communications by Valero or advice by Andersen.

In sum, the engagement letters do not reflect the exchange of confidential communications or tax advice between Valero and its tax advisers and thus are not protected under the tax practitioner privilege. *See Defazio*, 899 F.2d at 635.

### d. Other internal documents

Valero has withheld under the tax practitioner privilege numerous documents generated by Andersen or Ernst & Young that have internal personnel listed as recipients or that are marked as memoranda to file. These internal documents include items such as handwritten notes, numerical calculations, internal e-mails, and research findings.

Based on the Court's review, certain of these documents record or reflect tax

17

practitioner-client communications otherwise protected under the section 7525 privilege and are therefore privileged. *See Stafford Trading, Inc. v. Lovely*, No. 05 C 4868, 2007 WL 1238915, *6 (N.D. Ill. Apr. 26, 2007) (citing 8 J. Wigmore, Evidence § 2292 (MacNaughton rev. 1961)).  Those documents are:  AA001167, AA001264-1268, AA001427, AA002255-2257, AA002258-2259, AA003680-3681, AA004251-4257, AA009052, AA009182-9183, AA009651-9674, AA011247-11254, AA011255-11257, AA011261-11268, AA011269-11271, AA011274-11276, AA011277-11279, AA011280-11286, AA011287-11294, AA011298-11304, AA011305-11307, AA011368, AA011738-11741, AA011745-11746, AA012021-12022, AA012337, AA013695-13696, AA013700, AA013826, AA013843-13844, AA013910, AA013911, AA013919, AA013920, AA013923-13925, and AA0013926-13933.  Although document AA003680 contains a few references to Canadian taxes, the references to U.S. tax planning are too pervasive to redact them effectively.

Other documents represent communications between authorized tax practitioners at Andersen and Ernst & Young regarding their federal income tax consulting for Valero and thus are likewise privileged.  *See McCook Metals L.L.C.*, 192 F.R.D. at 255 (stating that "it appears implicit in present day litigation with multiple attorneys required for proper representation that attorneys must be allowed to confer with each other regarding the representation of a client on a privileged basis in the same way that clients must be able to discuss the advice of counsel amongst themselves on a privileged basis") (citations omitted).  Those documents are: AA001212-1217, AA001218-1221, AA001222-1224, AA001240-1244, AA001247-1251, AA001252-1255, AA001283-1284, AA001292, AA001824-1825, AA012034-12035,

AA012159, and AA013937-13938.

Other internal documents are not privileged. As discussed previously, these include documents that concern matters other than United States tax advice––most concern business or accounting advice or state tax issues. The Court rejects Valero's claim of the tax practitioner privilege for that reason with regard to the following documents: AA001262-1263, AA001555-1556, AA001549-1559, AA001810, AA001985, AA002249, AA002254, AA002418-2419, AA002420, AA002425-2427, AA002429, AA002545-2548 (both) AA004475-4476, AA007937-7942, AA007943, AA008534, AA008535, AA008545, AA008548-8549, AA008829, AA008831, AA009134, AA011340, AA011368, AA011690-11709, AA013689-13692, AA013746, AA013817, AA013820, AA013845-13846, AA013852, AA013857, AA013858, AA013859, AA013860, AA013907-13909.

Also not privileged are printouts of Internal Revenue Code provisions with some handwritten notes (AA002408-2413 and AA013829-13835). Neither are memoranda to the file or notes that do not reflect a communication between a client and a tax practitioner for the purpose of providing federal income tax advice. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21911066, *2 (N.D. Ill. Aug. 7, 2003). For that reason, the Court rejects Valero's claim of the tax practitioner privilege with regard to the following documents: AA001154-1158, AA001160, AA001597-1598, AA001607-1608, AA002228-2235, AA004033-4044, AA004469-4470, AA004471-4474, AA004564-4567, AA009109-9120, AA011239-11241, AA011344, AA011731-11737, AA011742-11744, AA013849, and AA013849.

The Court also concludes that Valero may not withhold as privileged document

19

AA002398, with the exception of the last sentence, beginning "Note . . . ." In addition, a significant portion of document AA013697-13698 concerns Canadian tax advice, which is not protected by the tax practitioner privilege. Specifically, the portion of the second paragraph beginning "From a Canadian tax perspective . . . ." and ending with "remaining of PUC" and the entire last paragraph of the document may not be withheld as privileged.

### e. Other communications between Andersen or Ernst & Young and Valero or Diamond Shamrock

The Court sustains Valero's claim of privilege concerning the following documents because they reflect confidential communications between Valero and Andersen or Diamond Shamrock and Ernst & Young made for the purpose of obtaining federal income tax advice: AA001333-1335, AA001792, AA002549-2577, AA003683-3710, AA003731-3757, AA004397-4425, AA004426-4454, AA008499-8500, AA008501-8503, AA008527-8528, AA008616-8619, AA009082-9083, AA009091-9101, AA009124-9133, AA009149-9158, AA011346-11351, AA012046, AA013720-13724, AA013737-13739, AA013815-13816, AA013821-13822, AA013823-13825, AA013827-13828, AA013836-13838, AA013841-13842, AA013847-13848, AA013851, AA013891-13896, AA013898-13904, AA013905-13906, AA013912-13918, AA013921-13922, AA013936. Documents AA003683-3710, AA003731-3757, AA013905-13906, and AA013921-13922 do contain, as Valero has conceded, Canadian as well as U.S. tax advice, but because the two are so completely intermingled, the entirety of each document is protected.

Because document AA011710-11726 concerns almost exclusively state tax advice, the Court rejects Valero's claim of privilege for that document, other than the

handwritten notes and the final two lines on page AA011719, which reflect federal income tax advice and which Valero may therefore redact. The Court also rejects Valero's claim of privilege for documents AA001327-1329 and AA001330-1332, which, based on the Court's review, concern business advice, with the exception of the paragraph appearing on both AA001328 and AA001331, beginning with "Per discussions . . . ", which Valero may redact because it reflects a confidential communication between Andersen and Valero regarding federal income tax advice.

### f.    Attorney-client privilege

Valero claims that the attorney-client privilege protects documents AA002254, AA002255-2257, AA002258-2259, AA013858, AA013859, and AA013860. The Court finds that because documents AA002255-2257, AA013858, AA013859, and AA013860 reflect confidential communications between Valero and its counsel at Fulbright & Jaworski and Wachtel, Lipton, Rosen & Katz, they are protected under the attorney-client privilege in their entirety. Certain portions of AA002254 and AA002258-2259 are also protected under the attorney-client privilege: the line on AA002254 beginning "Technical . . .", the lines beginning "Formalize . . . ." and "Obtain . . . ." on AA002258, and the first and last lines on AA002259. Although the remainder of these three documents are not protected under the attorney-client privilege, they are protected by the tax practitioner privilege and thus need not be produced.

### g.    Redacted document

Valero has not provided the Court with an unredacted version of document AA002990-3000. Without seeing what Valero has redacted, the Court cannot evaluate whether Valero's claim of privilege is appropriate. Valero is therefore directed to

resubmit this document without redactions for *in camera* review within seven days of entry of this order.

**3.      Tax shelter exception**

The government argues that even if the Court finds that Valero has established the required elements of the federal tax practitioner privilege with respect to any of the withheld documents, the Court still should order Valero to produce them because the tax shelter exception to the privilege applies.

Valero responds that the Court's August 23, 2007 determination that the government had failed to show a foundation in fact for the tax shelter exception is the law of the case and should not be revisited.  *See Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 454 (7th Cir. 2005) ("when an issue is once litigated and decided, that should be the end of the matter").  Valero argues that the government has not shown that the Court's earlier ruling was clear error or manifestly unjust and thus has not provided a basis for the Court to allow the government what amounts to a second bite at the apple.  *Cf. Arizona v. California*, 460 U.S. 605, 619 n.9 (1983) ("It is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.").

The government replies that application of the law of the case doctrine is inappropriate here because it would reward Valero for identifying a select group of documents, obtaining a favorable decision on them, and then claiming that law of the case protects from disclosure numerous additional documents whose existence it did not previously disclose.

The Court agrees with the government that the law of the case doctrine does not

22

apply. The parties' current dispute concerns a set of documents that is entirely distinct from the set of documents that the Court addressed in its August 23, 2007 decision. Both the tax practitioner privilege and the tax shelter exception apply—or do not apply—on a document-by-document basis. *See BDO Seidman v. United States*, 492 F.3d 806, 828 (7th Cir. 2007) ("*BDO Seidman II*"), *cert. denied*, 128 S. Ct. 1471 (2008). Just as the Court's earlier decision does not preclude Valero from offering new affidavits to support its claims of privilege regarding the new documents (as it has done), neither does it foreclose the government from submitting further evidence and arguments to support its contention that the tax shelter exception applies to these same new documents.

Under the tax shelter exception, the tax practitioner privilege does not apply to "any written communication between a federally authorized tax practitioner and a director, shareholder, officer, or employee, agent, or representative of a corporation in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii))." *See* 26 U.S.C. § 7525(b),[2] *BDO Seidman I*, 337 F.3d at 810. A tax shelter is defined as "a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, if a

---

[2]     Because the IRS's inquiry focuses on income tax liability that pre-dates the 2004 amendment to 26 U.S.C. § 7525(b), the Court applies the version of the tax shelter exception that existed prior to 2004. *See BDO Seidman II*, 492 F.3d at 821 & n.12. The American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004), amended section (b). The changes apply only to communications made after October 24, 2004. *See id.* 813(b), 118 Stat. 1418, 1581 (2004). The Act did not alter the elements of the tax practitioner privilege. Prior to 2004, however, subsection (b) referred to the definition of "tax shelter" that was then found at 26 U.S.C. § 6662(d)(2)(C)(iii). For ease of reference, the Court will refer to the current section of the tax shelter definition, which is found at 26 U.S.C. § 6662(d)(2)(C)(ii).

significant purpose of such partnership, entity, plan or arrangement is the avoidance or evasion of Federal income tax." 26 U.S.C. § 6662(d)(2)(C)(ii).

"As with any other exception to a claimed privilege, the burden rests on the opponent of the privilege to prove preliminary facts that would support a finding that the claimed privilege falls within an exception." *BDO Seidman II*, 492 F.3d at 822. The party opposing the privilege meets this burden by presenting "enough evidence to show some foundation in fact that the exception applies." *Id*. (citations and internal quotation marks omitted). Thus,

> the IRS must bring forward evidence that: (1) the communication relates to a tax shelter, as defined by § 6662(d)(2)(C)(ii); (2) the communication was made by a director, shareholder, officer, or employee, agent, or representative of the corporation; and (3) the communication was made in connection with the promotion of the direct or indirect participation of the corporation or tax shelter.

*Id.* at 828.

Ordinarily – by analogy to the crime-fraud exception to the attorney-client privilege – the Court would first assess whether it is appropriate to review the disputed documents *in camera*. *See United States v. Zolin*, 491 U.S. 554, 572 (1989).[3] That step, however, has effectively been bypassed with Valero's concurrence. During the earlier briefing that culminated in the Court's August 2007 decision, Valero volunteered to submit the disputed documents, without suggesting that any threshold showing was needed. *See* Valero Resp. to United States' Surreply (docket no. 29) at 7 ¶ 8. The Court followed the same procedure this time around, *see* Order of Dec. 21, 2007, and Valero neither interposed an objection nor suggested that the Court should first require the government to make a preliminary threshold showing supporting *in camera* review.

---

[3] The Seventh Circuit has not yet addressed whether courts should employ the procedure set forth in *Zolin* in the context of the tax shelter exception.

The Court has therefore considered the *in camera* documents in determining the applicability of the tax shelter exception. *See Zolin*, 491 U.S. at 570; *BDO Seidman II*, 492 F.3d at 818-19.

      **a.    Relationship of communications to a tax shelter**

To establish that the tax shelter exception applies, the government must give "colour to the charge" that the communications at issue related to the promotion of Valero's participation in a tax shelter. *See BDO Seidman II*, 492 F.3d at 818-19.

The government asserts that the Canadian refinancing that Valero undertook in 2002 constitutes a tax shelter under section 7525(b) because it qualifies as a "plan or arrangement" within the meaning of section 6662(d)(2)(C)(ii), a significant purpose of which was to avoid federal income taxes. In support of its contention that the refinancing is a plan or arrangement, the government states that wire transfer transaction documents it discovered among Valero's income tax returns referenced certain numbered "steps." Gov't Br. at 11; Gov't Ex. 1 ¶ 32. Valero representatives have acknowledged the existence of a plan with a number of steps, including the transactions on which Valero based its foreign exchange losses. Gov't Br. at 11-12; Gov't Ex. 1 ¶ 32. The Court finds that the government has made a *prima facie* showing of the existence of a "plan or arrangement" within the meaning of section 6662(d)(2)(C)(ii).

The government has also described, both in its brief and in a supplemental declaration from Agent Ryder, why it contends the avoidance of federal income taxes was a significant purpose of the series of transactions Valero entered into with its subsidiaries in 2002. At issue are foreign exchange losses that Valero claimed

25

pursuant to 26 U.S.C. §§ 987 and 988 on its 2002 tax return.  On its 2002 income tax return, Valero claimed a section 988 loss of approximately $56 million and a section 987 loss of approximately $49 million.  The government has produced evidence that Valero generated these losses via two sets of circular cash flows, one on May 10, 2002 and the other on July 1, 2002.  Gov't Ex. 1 ¶ 24.  On each of these two dates, Valero made numerous wire transfers between a number of bank accounts that it opened for one day only, apparently for the sole purpose of conducting a single transaction.  Gov't Br. at 12; Gov't Ex. 1 ¶¶ 27, 32.  At the end of the day on May 10, 2002, the government states, Valero transferred C$400 million to itself through subsidiaries that used the Canadian dollar as their functional currency.  Gov't Br. at 12; Gov't Ex. 1 ¶ 27.  Again on July 1, 2002, the government states, Valero transferred C$417 million to itself through a subsidiary that used the Canadian dollar as its functional currency.  Gov't Br. at 12; Gov't Ex. 1 ¶ 31.

The government contends that these 2002 transactions, along with a "check the box" election made by Valero Canadian subsidiary Ultramar Credit Corporation ("UCC"), were steps in a plan of which the $46 million in resulting U.S. federal income tax savings was a significant purpose.  Gov't Br. at 12; Gov't Ex. 1 ¶ 32.  As evidence that the tax savings through section 987 remittances were a significant purpose of the step plan, the government notes that an internal Andersen document from February 2002 stated that Valero's management was "taking a fresh look at the existing structure and . . . considering alternatives for refinancing the $275 million demand notes as well as distributing additional Canadian dollar funds to Valero."  Gov't Ex. 1 ¶ 21; Gov't Ex. 1-E at AA003147.  The government also cites, as evidence that section 988 losses were a

26

purpose of the step plan, a billing statement from Arthur Andersen for services provided in December 2001 in which Andersen states that it engaged in "consultation to ascertain ability to accelerate Sec 988 loss." Gov't Ex. 4 at 1. Finally, the government cites language from resolutions in May and June 2002 in which Valero's board of directors approved a step plan, one of the purposes of which was to "most effectively utilize certain foreign exchange losses associated with the maturity of certain debt obligations of an affiliate of the Company (the Project)." Gov't Ex. 1 ¶ 23; Gov't Ex. 1-G.

The Court finds that based on the totality of the circumstances, including the government's evidence outlined above, the government has met its burden of showing a foundation in fact that the transactions involved a tax shelter. In particular, there is a foundation in fact for the government's contention that Andersen was involved in formulating a circular, intracompany step plan for Valero and Diamond Shamrock to generate foreign exchange losses in May and July 2002, with a significant purpose of avoiding U.S. income tax. As noted earlier, on May 10, 2002, approximately C$400 million traveled in a complete circle between bank accounts opened for one day only by various Valero-related entities, ending right back where it started: with Valero. This circular set of transactions allegedly produced a significant section 987 loss for Valero, but, as Agent Ryder points out, the cash Valero laid out was under its control again within seconds, with no risk of loss. On July 10, 2002, Valero again orchestrated a circular transfer of funds, this time C$417 million, beginning and ending with Valero and allegedly resulting in a substantial section 987 loss. In the end, as Agent Ryder contends, Valero merely reclassified intercompany trade payables as intercompany loans—an objective that could have been accomplished by resolution and contract, or

27

by transferring funds directly, rather than through the use of circular cash flows. In sum, it is evident that tax avoidance was a significant purposes of Valero's transaction. Based upon the Court's review, certain of the documents that would otherwise fall under the tax practitioner privilege contain or reflect communications connected with the step plan and were thus "relate[d] to a tax shelter." *BDO Seidman II*, 492 F.3d at 828.

Because the government has met its burden of production, Valero is entitled to come forward with an explanation to attempt rebut the government's *prima facie* showing. *See BDO Seidman II*, 492 F.3d at 818. The explanation Valero has provided fails to do so.

Valero focuses its argument on why the transactions at issue had legitimate business purposes, rather than trying to explain how or why tax avoidance was not a significant purpose of those transactions. Valero contends that the IRS itself, through Agent Ryder's Supplemental Declaration, identifies "at least four highly-significant business purposes for the Canadian restructuring and refinancing transactions," including nearly C$13 million in annual Canadian tax savings, plus C$15 million savings in 2002; a means by which to pay $275 million in public debt due in July 2002; conversion of short-term debt into long-term debt; and allowing a subsidiary to make a distribution to its parent. Valero Resp. at 8.

Stripling, in his Supplemental Declaration, responds in greater depth to the government's arguments regarding Valero's section 987 and section 988 losses. Stripling explains that the losses "resulted from a depreciation of the Canadian dollar relative to the U.S. dollar over time" and that they are "substantively no different than if an investor had invested in Canadian dollars in the mid-1990s and sold that investment

28

in mid-2002." Valero Ex. C. ¶ 18. That was not, however, the origin of Valero's losses. Rather, as discussed above, the losses were generated through an extensive series of carefully orchestrated transactions in the spring and summer of 2002.

Stripling also contends that Valero's section 987 loss was simply the result of "fortuitous timing of a distribution while the Canadian dollar was weak," Valero Ex. C ¶ 22, and that the losses under sections 987 and 988 were a "natural result" of Valero's activities, not a significant purpose of them. Having reviewed Valero's *in camera* documents, the Court cannot accept this contention. Indeed, several of the documents from Andersen referred to the need to imbue the planned transactions with one or more business purposes so that they would be less likely to draw the scrutiny of the IRS. It appears to the Court that the tax avoidance objective for the step plan preceded whatever business purposes Andersen later developed, not the other way around.

Valero concedes that it attempted to structure these transactions "in a tax-efficient way." Valero Resp. at 8. It denies, however, that its tax planning constituted tax avoidance, and it contrasts the transactions with those found to lack economic reality by the court in *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 34 (Fed. Cl. 2007). In *Jade Trading*, in which the pre-packaged tax product BDO Seidman had marketed to the taxpayer was not designed to create a profit, the court determined that tax avoidance was a significant purpose of the product and found that the transactions met the definition of a tax shelter. *Id.* at 46. Valero contends that unlike the transactions at issue in *Jade Trading*, its own Canadian transactions reflected economic reality and other business purposes.

As the government notes in its reply, however, *Jade Trading* was a tax refund

29

case in which the taxpayer sought a refund based on a specific transaction, requiring the taxpayer to establish that the transaction had economic substance under the common law economic substance doctrine. *See id.* at 13. In other words, the case did not involve the tax shelter exception to the tax practitioner privilege. Thus the court in *Jade Trading* did not address whether a transaction must lack economic substance to constitute a tax shelter under section 6662(d)(2)(C)(iii). Nor has Valero cited any other authority so holding. The Court concludes that to establish the applicability of the tax shelter exception, the government need not demonstrate that the underlying transaction lacked economic reality or was driven solely or primarily by tax-avoidance concerns; that is not what the statute requires when it provides that the government must show that the communication relates to a plan or arrangement "a significant purpose of which" was the avoidance or evasion of federal income tax.

The government also suggests that the business purposes alleged by Valero during IRS administrative proceedings—such as refinancing public debt, reducing Canadian income taxes, and moving business from one company to another—are unrelated to the transactions that allowed Valero to claim huge losses, would not provide a benefit, or could have been accomplished without the circular transactions that generated the foreign currency losses. For example, though Valero contends that interest deductions from loans between related companies resulted in Canadian income tax savings, the government responds that that interest would be taxed as income to the related lender company, canceling out any Canadian tax savings. And though Valero asserts that it needed to restructure its debt to avoid a downgrading of its bond rating, the government notes that the funds used to restructure the debt came from Valero

30

itself, thereby reducing the assets available to Valero's creditors at the parent level—arguably a paradoxical result for a company seeking to maintain its bond rating. The circuitous route that Valero actually used to accomplish its claimed business objectives provides further support for the conclusion that tax avoidance was, at a minimum, a significant purpose of the transactions.

### b. Parties involved in communications

To fall within the tax shelter exception, a communication must be between a director, shareholder, officer, employee, agent or representative of the corporation and a federally authorized tax practitioner. *See BDO Seidman II*, 492 F.3d at 828. As the government notes, if Valero establishes that certain documents preliminarily fall under the tax practitioner privilege, then those documents necessarily represent the kind of communication that falls under the tax shelter exception; the requirements for the privilege and the exception are identical in this regard.

### c. "Promotion" of tax shelter

Finally, Valero argues that the government has failed to show that the communications between Andersen and Valero were made in connection with the "promotion" of Valero's participation in a tax shelter, as required by § 7525(b). Valero cites the single case that has discussed the meaning of the word "promotion" in the statute, *United States v. Textron, Inc.*, 501 F. Supp. 2d 138, 148 (D.R.I. 2007), for the proposition that the tax shelter exception should only apply to the peddling of pre-packaged tax shelters. The court in *Textron* held that the tax shelter exception did not apply because the accountants involved in the communications in that case were not "'peddlers of corporate tax shelters' or outside promoters soliciting . . . participation in

31

the . . . transactions." *Id.* The court found that the accountants were not trying to promote future transactions; instead, they were analyzing the foreseeable tax consequences of transactions that had already taken place. *Id.* In coming to this conclusion, the court drew largely on the legislative history of the tax shelter exception, quoting both the Congressional Record and the Conference Report relating to the provision. In particular, the court seemed persuaded by the statement of Senator Connie Mack, whom the court quoted as saying that the exception "was meant to target written promotional and solicitation materials used by the peddlers of corporate tax shelters." *Id.* (quoting 144 Cong. Rec. S7643-02, S7687 (Jul. 8, 1998) (statement of Sen. Mack)).

Valero contends that rather than peddling tax shelters, Andersen was simply reviewing work that Ernst & Young was performing in connection with Valero's Canadian restructuring and refinancing. Valero asserts that the presentations Andersen gave to Valero are representative of a routine tax advisor-client relationship.

The government, in response, challenges Valero's narrow construction of the word "promotion" in reliance on the statement of a single legislator. The government argues, citing *Garcia v. United States*, 469 U.S. 70, 76 (1984), that statements such as Senator Mack's should not receive as much weight as the language of the statute itself and reports of the conference committee. The government further asserts that neither the statutory language nor the committee report relating to section 7525 references pre-packaged products, nor do they confine the meaning of "promotion" to selling or marketing, as Valero urges. Furthermore, as the government notes, 26 U.S.C. § 6700, a provision imposing a penalty for promoting abusive tax shelters, applies to a person

32

who "organizes (or assists in the organization of)" a tax shelter as well as a person who "participates (directly or indirectly) in the sale" of one. Because section 6700 was in effect at the time that Congress passed section 7525, the government contends, Congress can be presumed to have contemplated a similar meaning for the word "promotion" in section 7525.[4]

The Court agrees with the government that the word "promotion" in section 7525 does not limit the scope of the tax shelter exception to communications aimed at selling or marketing pre-packaged tax shelter products and that it can also be understood to apply to a person who organizes or assists in organizing a tax shelter. Beyond that, the Court also agrees with the government's second argument—that even if Ernst & Young was the promoter of the step plan, Andersen still reviewed and provided input on the proposal "in connection" with Ernst & Young's promotion of it. Unlike the tax advisers in *Textron*, Andersen was not simply reviewing historical transactions and advising Valero on what their likely future tax consequences would be; instead, it was itself advising Valero on proposed Canadian refinancing transactions. The government notes, for example, that a statement of charges that Valero produced relating to services Andersen provided on March 6, 2002, indicates that Andersen created a PowerPoint presentation "describing proposed refinancing and additional intercompany financing of the $275 million and C$400 million debt amounts." Gov't Ex. 1-F. In addition, a February 10, 2002 email between Andersen personnel refers to a tax strategy called "Intercompany Foreign Currency Loans" and "discusses paying off an intercompany

---

[4] Although the government cited no authority for this proposition, Congress can be presumed "knowledgeable about existing law pertinent to legislation it enacts." *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1581 (Fed. Cir. 1990) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)).

note for tax purposes and replacing it with a note of the same amount." Gov't Ex. 1 ¶ 20. In sum, the government has established an adequate factual basis showing the "promotion" of Valero's participation in a tax shelter under section 7525.

### d. Documents to be produced pursuant to tax shelter exception

Based on the determinations the Court has just made, the Court finds that the government has met its burden of showing the applicability of the tax shelter exception with regard to the following communications between Valero or Diamond Shamrock and Andersen or Ernst & Young: AA001333-1335, AA003683-3710, AA003731-3757, AA012046, AA013720-13724, AA013737-13739, AA013821-13822, AA013823-13825, AA013827-13828, AA013836-13838, AA013841-13842, AA013847-13848, AA013891-13896, AA013898-13904, AA013905-13906, AA013912-13918, AA013921-13922, and AA013936. The Court likewise finds that the government has met its burden with regard to the following internal memoranda and documents: AA003680-3681, AA013700, AA013826, AA013843-13844, AA013911, AA013920, AA013923-13925, and AA013926-13933. The Court also finds that the government has met its burden as to the following internal emails: AA001212-1217, AA001240-1244, AA012034-12035, and AA012159.

The Court has also reviewed the portions of otherwise non-privileged documents that it indicated Valero could redact because of the tax practitioner privilege. The Court finds that there is a foundation in fact for the tax shelter exception with regard to the redacted portions of the following non-privileged documents: AA001327-1329, AA001330-1332, AA002398, and AA013697-13698.

34

**5.      Production or description of non-responsive documents**

The government argues that Valero has not been forthcoming with responsive documents and that as a consequence, the Court should require Valero to describe the entire universe of documents in its possession, specifying which categories it considers responsive and which it considers nonresponsive.  The government contends that Valero's identification of only half a box of documents as responsive, out of a total of twenty boxes that it reviewed, suggests that Valero is construing responsiveness too narrowly.  Valero is trying to have it both ways, the government contends, by stating that one of the purposes of the transactions for which it retained Andersen's services was to save Canadian taxes while at the same time arguing that almost all documents responsive to the summons relate only to United States income tax advice.

In response, Valero has described the process of its review, reminding the government and the Court that because Andersen is defunct, the burden of reviewing its records fell entirely on Valero.  Valero states that Andersen's role advising Valero on Canadian taxes was quite limited and that this accounts for the scarcity of responsive documents relating to Canadian taxes.  In addition, Valero notes, the government provides no basis for its contention that Valero has repeatedly failed to produce responsive documents.  The Court agrees and therefore rejects the government's request to require Valero to further describe its non-responsive documents.

**6.      Documents involving unrelated client**

Finally, Valero seeks the Court's ruling on "client confidential" objections it previously asserted to the production of documents AA003174-3175 and AA003176-3179 but that the Court did not address in its August 27, 2007 opinion.  Valero contends

35

that Andersen inadvertently turned over these documents to Valero for review even though they concern tax advice Andersen provided to other clients. Valero has produced to the government document AA003174-3175, an internal Andersen email, with client identifying information redacted. It has withheld completely, however, document AA003176-3179, a memorandum for another client that was originally attached to the email.

The government argues that the documents are both responsive—having been emailed between Andersen personnel during discussions of Valero's foreign currency loans—and not privileged under the tax practitioner privilege, the elements of which the government contends Valero has failed to establish.

As Valero points out in its reply, however, it is not asserting the tax practitioner privilege over these documents. Rather, it objects only to the disclosure of the identity of the unrelated client referenced in Andersen's documents. Valero has therefore offered to turn over to the government document AA003176-3179 with the client identifying information redacted and informs the Court that the government is considering this proposal. The Court sees no basis to require the production of documents unrelated to Valero and thus sustains its objections to the production of these documents.

## Conclusion

For the foregoing reasons, the Court grants the government's motion for a further order of enforcement of the IRS summons to the extent outlined above and denies it to the extent outlined above [docket no. 49]. The Court directs Valero to produce the documents responsive to the second summons that it has thus far withheld based on a

36

claim of privilege that the Court has overruled.  The case is set for a status hearing on August 20, 2008 at 9:30 a.m.  Counsel are ordered to appear at that time to discuss what issues remain for determination prior to disposition of this case.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 1, 2008